### JUDGMENT REVERSED FOR OFFENSIVE CONDUCT OF COUNSEL.

Common Pleas Court of Cuyahoga County.

### A. M. GORDON V. JACOB KLEIN.

Decided, January 10, 1917.

*Trial—Scenes of Disorder Among Counsel—Coupled With Offensive Conduct Afford Ground for Awarding a New Trial—Notwithstanding the Judgment is Supported by the Evidence.*

In an action at law tried by the judge without the intervention of a jury, if the record shows an apparent fair preponderance of evidence in favor of the party against whom the judgment is rendered, a reviewing court will reverse the trial court where the record discloses such offensive conduct and repeated and prolonged scenes of disorder by counsel and contention between counsel and court as to unsettle the mental balance of the court and counsel and seriously disturb the orderly conduct of the trial. Under such circumstances, in the interest of justice, a new trial should be granted and the cause tried *de novo*, even if the judgment is not manifestly against the weight of the evidence, and notwithstanding the opportunity the trial judge had of seeing the witnesses and hearing them testify.

*James Metzenbaum,* for plaintiff in error.
*Bernsteen & Bernsteen,* contra.

FORAN, J.

This case comes into this court on error from the municipal court, in which judgment was rendered against the plaintiff for costs. The parties, therefore, stand here in the same relation they stood in the court below.

The action was on a written contract for commissions for the sale of real estate, and was tried to the court and decided March 3, 1915. Thereafter, on May 17th, 1915, a bill of exceptions was tendered to the trial judge, who, before allowing the same, interlined these words: "Amended so as to be a true bill of exceptions." The so-called amendments are in the handwriting of the

learned trial judge, and present to the reviewing court a rather peculiar and perplexing question of ethical procedure and judicial decorum. On the first page of the bill we find on the margin this somewhat unique and startling interlined amendment:

"Before the opening statement counsel for plaintiff asked the court if this branch of the court had any objections to hearing the case, stating that his reason for so asking was, that in error proceedings in the case of *The Euclid Beach &Supply Co.* v. *Kavanagh* from this court's decision counsel for plaintiff had succeeded in having this court's decision reversed. Fearing, therefore, there might be prejudice on the part of the court, counsel for plaintiff was assured the court was not prejudiced, but that, instead, his client would be dealt with according to law and the facts of the case."

It is indeed truly refreshing to note that "counsel for the plaintiff was assured the court was not prejudiced, but that, instead, his client would be dealt with according to the law and the facts of the case." We have here no wise, self-conscious, posing judge blinking like an owl, silent as a sphinx, with a head full of riddles and kinks, but a fearless jurist who cleaves the murky, disingenuous atmosphere of the trial table with a blinding flash of truth that a court is a forum where justice is dispensed and causes decided according to the law and the facts.

While this observation may seem trite, if not mildly satirical, it may nevertheless be timely, for counsel have, at times, a dim suspicion that the statement is not wholly true, and this suspicion may sometimes have a basis of truth in cases where a judge is acting in the dual capacity of trier of fact and expounder of law; for all men, including judges, irrespective of honesty of motive, may unconsciously be swayed or prejudiced by a bias subconsciously acquired.

In this case it is significant that the learned judge should have retained in his mind for two months and more the bitter impressions created during the trial by the rasping misconduct of counsel. The amendment just cited is, of course, not properly a part of the record. This the court undoubtedly fully appreciated, and its insertion must be regarded as mildly vindictive or meekly suggestive of judicial apology.

Meeting this startling interpolation at the very forefront of our investigation, we were prepared to find the demon discord stalking into the court room and with wild tumult derange and throw out of balance the conventional decorum of the forum and unsettle and confuse the peace and mental equilibrium of the court, and perhaps tear from the court room walls the maxim *"ne vile fano"*; nor were we disappointed. If, in the former trial to which allusion is made, the court had murdered the pride of counsel, it soon arose at the trial table, a spirit of evil, and, like Banquo's ghost, shook its gory locks at the affrighted judge, and thereafter "Confusion heard his voice and wild uproar."

On page 4 we find that after an objection had been sustained, "counsel for plaintiff argued." This was bad form, but it is frequently tolerated, and may be proper as counsel may have suggestions to offer overlooked by the court. However, it is often indicative of a perturbed condition of mind upon the part of counsel. But why should this trivial incident be inserted as an amendment to the bill or record? We confess the answer eludes our comprehension.

Again, we find on page 6 that counsel was guilty of some impropriety, which, however, was "cut short" by some timely remarks by the court.

On page 67 we find counsel for the defendant, during the cross-examination of the plaintiff, addressed the court as follows: "Now, if your Honor please, I insist upon Gordon looking at me instead of at Mr. Metzenbaum." The record as presented to the trial judge shows nothing further except that counsel for plaintiff addressed some discourteous remarks to counsel for the defendant; but the bill as amended by the court presents this remarkable insertion or memorandum: "The court observed that the witness was looking at Mr. Metzenbaum as he answered questions, and that Mr. Metzenbaum was shaking his head from time to time."

If this was true—and we must assume it to be true because the bill or record imports verity—it was such unprofessional conduct on the part of counsel as would justify the court in taking such summary action as would have prevented its repetition

and taught counsel a lesson in legal ethics, which was conveniently forgotten if ever acquired. But the record does not show that counsel was even mildly admonished. And thus in confusion, contention and disorder the trial, if it can by courtesy be so called, proceeded or haltingly limped along, counsel for plaintiff evidently, like Tom O'Shanter's wife, nursing his wrath to keep it warm until, on pages 77 and 78, we find it bursting into flame over the edges of assumed restraint. At this point it seems that the court and counsel indulged in verbal pyrotechnics concerning some testimony counsel claimed the plaintiff had previously given. On the margin of page 77 the record is "amended so as to be a true bill of exceptions" by the insertion on the margin of the page of the following historical statement:

"At this period Mr. Metzenbaum ceased asking questions, and he and the stenographer spent seven minutes looking for the testimony which Mr. Metzenbaum declared Mr. Gordon had given. During this time Mr. Metzenbaum bore a sneering expression and was plainly trying to irritate the court. After seven minutes delay, during which no leave was asked or any statement made by Mr. Metzenbaum, the court ordered the case to proceed, telling Mr. Metzenbaum to ask further questions or call another witness."

If the trial of the cause was delayed seven minutes, as here related, it is quite evident that the court permitted and tolerated the delay. In the bill as presented to the trial judge the record shows that what the court said was: "You may ask him any questions, or call another witness." These words are erased and the marginal amendment above indicated inserted. The record then proceeds to say that counsel for plaintiff said: "Will the stenographer please make a record of the statement of the court and my exception to that." The court adds in writing to this statement of counsel these words: "This remark of Mr. Metzenbaum made with a sneering and irritated air." After some further disorderly procedure, the court ordered the plaintiff to leave the witness chair. An explanation of this incident is found by an inserted amendment on the margin of page 78, and reads as follows:

"At this point the court said, 'Mr. Gordon, you may step down. Mr. Metzenbaum, call another witness if you have any more testimony to offer.' Again Mr. Metzenbaum remained silently defiant with disrespectful expression and manner. Up to this time in the trial of the case Mr. Metzenbaum's conduct was practically continuously defiant and occasionally varied by contemptuous glances and grimaces, all of which the court attempted to forbear to notice."

This court would be much benefitted and aided if there had been attached to the bill as an exhibit a photograph of the sneer of counsel for plaintiff, showing the silently defiant and disrespectful expression, as well as the contemptuous sneers indicated by the court. For aught that appears from the record, the facial expression complained of may be wholly natural. No doubt by this time the court felt like Douglas Jerrold, that the ugliest trades or professions have moments of pleasure, and that if he were a grave-digger or even a hangman, there were some people he could work for with a great deal of enjoyment; but why did the court permit justice or order to be "withered to a sneer"? The court had ample power to suppress contemptuous glances, sneers and grimaces, or any other disorderly or defiant conduct of counsel. By inserting these things in the record, it seems the court is apparently willing now to wound, though failing then to smite. It may be that when he observed the antics of counsel he saw "a laughing devil in his sneer," and was more amused than offended; or perhaps he felt as did the poet who, observing the fantastic girations of a sportive simian, exclaimed:

"Look now at his odd grimaces;
"Saw you e'er such comic faces?"

Obviously, however, the court did not regard the unethical misconduct of counsel as the grotesque aberrations or the peevish, pettish tantrums of an unruly member of the bar, for he says he "attempted to forbear to notice it." But if he attemped to ignore it then, why notice it now? He should either have suppressed it by the rigorous severity which order and decorum demanded, or he should have continued to treat it with the con-

tempt he believed at the time it merited.  An appropriate criticism of the conduct of counsel and the attitude of the court will be found in *Railroad* v. *Pritschau,* 69 O. S., 448, where Shauck, J., in the opinion says:

"Throughout the record a trial judge, personlly distinguished for learning and probity, appears as a grieved observer of continued improprieties which he thought himself powerless to suppress.  It is entirely clear that he was unable to end them by admonition and entreaty, but he was clothed with ample power to suppress them inexorably.  The county in which he sat has the full complement of county buildings."

The senseless fear of counsel for the plaintiff that the court might not decide the case according to the law and the evidence because of his fancied belief that the court had some grievance against him indicates a mind dominated by the brooding ogre of suspicion, which furnishes some attorneys of narrow vision an excuse or an apology for their own lack of diligence and legal training.

The lawyer who, by open assertion or cowardly innuendo, intimates that a judge's decision was prompted by other than honest motives is a pestiferous nuisance, deserving only of pity and commiseration.  To lawyers of this class, every judge who decides against him, or who seeks to enforce order or expedite business, is a rascal or is in collusion with the other side.

During the last forty years we have seen many judges on the bench, some of whom habitually wore an expression of surprise rather than of conscious strength, and whose acts at times might be termed the petty tyrannies characteristic of small men in accidental authority; but the judge whose rulings were actuated by corrupt motives we have never met or seen.  Suspicion is not rooted in the mind of an honest man; it is a mirror in which some men see reflected the dark outlines of their own sinful souls.  "All looks yellow to the jaundiced eye."  It was said of old by Milton that "Suspicion sleeps at Wisdom's gate," but our experience is that this brooding demon never sleeps at all.  We are toxemia.  The calumnies it engenders never mislead or deceive consoled, however, by the reflection that it eventually dies of auto-

the man of good will, and its shafts of venom rarely injure the man of rectitude who studiously ignores its confidentially whispered slanders.

There is at present a tendency toward greater freedom of action and speech in the American judicial forum. It may be true that the reign of the gown and mace is no longer desirable as impressive accessories of a court room. It should not be forgotten, however, that the lawyer, the litigant, the witness and the bystander will give and pay to the judge presiding in a court room only the respect and deference his conduct exacts and demands; and when freedom of speech and court room manners degenerate into town-meeting license, the administration of justice becomes a farce and respect for law and order vanishes and disappears.

In a recent letter to the president of the Cleveland Bar Association we said:

"The fact is there is too much politics practiced upon the bench; that is, the desire to avoid offending attorneys, or perhaps a desire to please them, is largely responsible for many evils in judicial procedure. Many lawyers are losing respect for the judges because the judges sometimes, by indifference to form, deportment and lack of firmness, forfeit respect lawyers would otherwise most cheerfully manifest and show upon all occasions and under all circumstances in the forum. Of course I do not mean offensive firmness or stilted, self-conscious form or deportment. We can all be true to the traditions of the bench and bar without loss of individual manly dignity. It may all be embraced in the maxim of St. Ambrose, which, freely translated, is, 'When at Rome, do as the Romans do.'

"Any lawyer or judge can do, while engaged in judicial affairs or in the administration of justice, what always has been done in courts, without loss of respect or dignity. It will not injure any one of us to occasionally look in the old mirror of ethical and judicial fashion and be always true to the ethical and judicial form. If the legal profession is to retain the respect and confidence of the public, it must retain its *sui generis* character, its distinctive traditional individuality of the best and most accepted qualities of moral excellence. Some writer—I can not now recall—said that grandeur consists in form. If this be true, every man should be true to the form characteristic of his calling or profession. When I speak of form I mean that conduct which is in conformity to the long established proprieties, convention-

alities and usages of the courts and the legal profession or that ethical element of the law that has been imported into it by the greatest juridical minds of all the ages.''

The greatest asset man can acquire or posses is that attribute of character which will, because of its prominence, impel all men to say of him that he is at all times and under all circumstances a cultured, affable gentleman. This is character stock which never fails in any walk of life to pay large dividends.

In one of his essays the poet Coventry Patmore said that noble manners is an art that continues to be practiced in Heaven after we pass into the other life; and he touches the very heart of the matter when he says that obedience is the secret of noble manners. This does not mean a servile obedience born of fawning sycophancy, but does mean that obedience which springs from and is rooted in love of harmony, law and authority. Obedience to the unchanging laws of life and conscious courtesy which it engenders, instead of degrading, ennobles and beautifies character and leads to dignified and graceful manners. The sun, moon, planets and stars unswervingly obey a great immutable law. As the existence of the universe depends upon harmony and order, so also does the social, physical and spiritual well-being of man. If men who practice and administer law as a profession do not, by example as well as by precept, teach obedience and respect for authority, how can they expect others to do else than follow in their footsteps?

There is in man an inclination to pride and self-will, and he seeks to justify the excesses that grow out of these tendencies by the claim that the assertion of individualism is a natural right, forgetful of the fact that order demands that every right be limited by or is limited by a duty. It has always been true that many believe with Heine that ''the Devil is really a handsome and charming man,'' and that those who advocate order and the reign of law are narrow-minded, disagreeable intruders whose activities ought to be suppressed. It was Cicero who said, ''*Qui modeste paret videtur qui aliquando imperet dignus esse*'' [he who obeys with modesty appears worthy of some day being a commander].

Surely it is true that he who can conquer himself is entitled to greater praise than he who takes or conquers a city.

But it will be said that judges should possess such equanimity of spirit, poise and temperament as will at all times enable them to ignore the ebullient outbursts of the self-conscious young sapients of the bar who never heard of the admonition of the prophet, "Tarry at Jericho until your beards be grown." There is perhaps much truth in this contention, but suppose the judge has so schooled himself as to have absolute command of his tongue and facial muscles, still it must be admitted that, as a man, he feels, and the words of the Psalmist may be applied to him: "The words of his mouth were smoother than butter, but war was in his heart." And this being true, is he in such frame of mind as to accurately weigh testimony and correctly judge its value or detect its infirmities? If it be true that you "measure your mind's height by the shade it casts," who will say that there may not be dark confusing shades of thought reflected in a mind that has been under the influence of repeated and prolonged scenes of tumultuous disorder? The constant attrition and irritation of such scenes of tumult, disorder and distraction as this record discloses were certainly not calculated to produce serenity of mind and clarity of vision. It is often said that the mind is like a sheet of white paper in this, that black impressions remain longest upon it, and this is demonstrated by the so-called "amendments" the trial judge inserted in the record now before us. We have read the record very carefully, and while there is apparently a fair preponderance of evidence in favor of the plaintiff, yet the trial court having seen the witnesses and heard them testify, we are not prepared to say that the court, if the conditions were normal, reached an erroneous conclusion. But the conditions were not normal; and while counsel who created these conditions should not profit by his own wrong, yet it would be dangerous and unjust to punish a litigant for the misconduct of his counsel.

The situation we find is this: The plaintiff's evidence as disclosed by the record is of sufficient probative value and force to enable any intelligent mind to draw a rational conclusion

therefrom in support of the plaintiff's right to recover. This being true, should the judgment of the trial court be disturbed? Ordinarily, it would not be unless it was clearly and manifestly against the weight of the evidence.

At the conclusion of the testimony counsel for the plaintiff waived the opening argument, whereupon the court said he did not care to hear from counsel for defendant, and promptly dismissed the plaintiff's petition. Ordinarily, before a judge decides against the plaintiff he indicates to his counsel a desire to hear from him, if he has not already been heard, and points out to him wherein he has failed; and it sometimes happens that after a review and discussion of the evidence and the law the situation is so clarified that the judge may change his mind, or at least take time to carefully consider the law and the evidence from the plaintiff's point of view. We think, therefore, the abrupt termination of the trial rather significant. If the facts admitted of no rational conclusion except that reached by the court, it could be viewed as a well-merited rebuke to counsel; but to the reviewing court, in view of all the evidence and circumstances, it indicates an irritated, perturbed mental attitude, which, under more favorable and benign circumstances, the court would not assume. Hence we hold that in an action at law tried by the judge without the intervention of a jury, if the record shows an apparent fair preponderance of the evidence in favor of the party against whom the judgment is rendered, a reviewing court will reverse the trial court where the record discloses such offensive, repeated and prolonged scenes of disorder by counsel and contention between counsel and court as to unsettle the mental balance of court and counsel and seriously disturb the orderly conduct of the trial. Under such circumstances, in the interest of justice, a new trial should be granted and the cause tried de novo, even if the judgment is not manifestly against the weight of the evidence, and notwithstanding the opportunity the trial court had of seeing the witnesses and hearing them testify.

For the reasons indicated, the judgment of the municipal court will be reversed, because it is against the weight of the evidence, and the case will be remanded for further proceedings.